**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**DAWN MENNE,**

**Plaintiff,**

v. **CASE NO.: 2:13CV48**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

**Defendant.**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Dawn M. Menne ("Menne") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance under Title II of the Social Security Act. 42 U.S.C. §§ 401-434. Specifically, Menne claims the ALJ improperly evaluated the opinions of her treating physicians and erred in concluding that she had the residual functional capacity to perform light and sedentary unskilled work. (ECF Nos. 1, 10). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

## I. PROCEDURAL BACKGROUND

Menne filed an application for disability benefits, alleging disability beginning August 1, 2007, due to seizure disorder, fibromyalgia, spinal disc bulges, and migraines.[1] (R. 34, 125, 155). The Commissioner denied her application initially (R. 88-92), and upon reconsideration.

[1] In her initial application for benefits, Menne indicated that her alleged onset date was August 31, 2007. (R. 125). She later amended that date to April 1, 2007. (R. 133). At the ALJ hearing, however, Menne again amended the alleged onset date to August 1, 2007. (R. 34).

(R. 95-101). Menne requested an administrative hearing (R. 104), which was conducted in Norfolk on July 21, 2011. (R. 10, 26).

An Administrative Law Judge ("ALJ") concluded that Menne was not disabled within the meaning of the Social Security Act, and denied her claim for disability benefits. (R. 10-20). The Appeals Council denied review of the ALJ's decision (R. 1-3), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), on January 31, 2013, Menne filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II. FACTUAL BACKGROUND

Menne, a 5'7" and 135-pound female, was born on April 24, 1975, has a partial college education, and became a licensed practical nurse through the Army. (R. 32, 175). She served in that capacity – first in the Army, and subsequently in the Army Reserve – from 1993 until 2003. (R. 180). Plaintiff also worked in a nursing home between 1996 and 1997 before transitioning into office management. Id. She was fired from her most recent job as manager for Airtime Watersports in April of 2007 due to repeated absences because of her daughter's medical condition. (R. 32-33). While she would have continued to work at that time had her daughter not required medical care, Menne testified that she personally became medically unable to work as of August 2007. (R. 33). Even so, she maintained a personal sales business through December 2010 (R. 42), though this was not a very lucrative venture. (R. 47).

Between August 2007 and September 30, 2008, Plaintiff's last date insured (R. 10), Menne reportedly suffered from recurrent transient ischemic attacks ("TIAs"), depression, suicidal thoughts, and seizures. (R. 35). She first testified that she had endured four TIAs during that time period. Later she stated she was suffering approximately 8-10 seizures each month.

(R. 38). Despite her claims, she was not on any kind of seizure medication. Id.

Records taken between 2007 and 2008[2] from Menne's primary care physician, Dr. Alison Christian-Taylor, indicate that she suffered from fatigue, palpitations, headaches, dizziness, and heaviness of limbs which she attributed to her recurrent TIAs. (R. 314, 316, 317, 323). They did not, however, diagnose Menne with any kind of seizure disorder. (R. 311-28).

On March 3, 2008, Menne was admitted to the Portsmouth Naval Medical Center's Emergency Department for an alleged TIA. (R. 377). The discharge summary indicated that Plaintiff's reported symptoms – difficulty speaking, dizziness, headache, and left sided weakness – were similar to episodes she had had in August 2007 "in which she experienced vision loss and total left sided weakness." Id. The summary also noted that an MRI/MRA of the brain, however, "showed no evidence of ischemic changes, scarring, or any acute intracranial process." (R. 380). Menne was discharged on March 4, 2008 with a diagnosis of an "atypical migraine." Id. At discharge, she was "symptom free" according to her discharge summary, and ambulating normally. Id.

Dr. Qingyan Zhu, a neurologist, examined Plaintiff in April 2008 at the request of Dr. Christian-Taylor. (R. 230-31). Dr. Zhu noted that Menne had reportedly experienced one TIA per week on average since August 2007. (R. 230). She had had multiple MRIs and MRAs of the brain, the most recent one taken on March 2, 2008, and "all were normal." Id. Dr. Zhu also observed that Menne had a patent foramen ovale ("PFO"), a cardiac defect that was possibly the

[2] In order for Menne to qualify for disability insurance benefits, she must prove that she became disabled prior to the date she was last insured – in this case, September 30, 2008. See Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005). Indeed, as this Court has stated, "[t]he ALJ's decision must emphasize evidence of a disability that is established before the date last insured." Groover v. Astrue, 2:09CV507, 2010 WL 5825426 (E.D. Va. Oct. 19, 2010) report and recommendation adopted, 2:09CV507, 2011 WL 652479 (E.D. Va. Feb. 9, 2011). Accordingly, the Court – like the ALJ – has limited its review to those medical records that correspond with the relevant time period at issue, August 1, 2007 (the alleged onset of disability) through September 30, 2008 (the date last insured), unless records after that date are relevant to Menne's disabling conditions before her date last insured.

cause of her TIAs, and intended to follow-up with her after cardiac surgery to close the PFO was complete. (R. 231). Dr. Zhu recommended Plaintiff continue Plavix and Zocor for stroke prevention, but did not mention seizures. Id.

Also at Dr. Christian-Taylor's request, Menne met with Dr. Brinda Dixit of the Virginia Rheumatology Clinic between January and April 2008. (R. 232-236). At her initial consultation, Menne discussed her fibromyalgia with Dr. Dixit, primarily complaining of pain. Id. Over the ensuing visits, Dr. Dixit noted that Menne did not have acute synovitis, her sensation was grossly intact, lab results were unremarkable, she had a history of fibromyalgia, and she was having repeated TIAs. (R. 232-36). While Dr. Dixit originally noted that Menne had fibromyalgia "with worsening symptoms over the past few months" (R. 235), by April 25, 2008, her fibromyalgia was "improved and stable . . . ." (R. 232).

On May 5, 2008, Plaintiff underwent surgery to correct her PFO. (R. 372-76). Menne followed up with her cardiologist on August 21, 2008, and reported having had two TIAs since her procedure. (R. 361). It was noted that while Menne reported palpitations occurring daily with light-headedness, she was "[f]eeling as well as can be expected . . . ." Id. She also had no other cardiovascular symptoms or chest pain, and no neurological symptoms. Id. The attending nurse considered her to be alert and oriented, and in no acute distress. (R. 362). She was directed to wear a heart monitor and was "[r]eleased [without] [l]imitations," to follow-up after the monitoring was complete. Id.

Prior to her follow-up with cardiology, Plaintiff went back to the emergency room at the Portsmouth Naval Medical Center on August 5, 2008. (R. 367). She was admitted with "transient left sided weakness." Id. During her time in the emergency department, Menne's symptoms resolved without any treatment and her speech was reported as being slow, but

normal. (R. 370). She was evaluated by neurology, which determined that this was not an ischemic event. Plaintiff was ultimately admitted overnight for observation, but was discharged in the morning after an uneventful evening. Id. Her speech had regained its normalcy, and a CT-scan of her head and x-ray of her chest revealed no abnormalities. Id.

Menne's medical records also reflect that she sought treatment at Churchland Psychiatric Associates from January 2008 through her date last insured. (R.439-458). It appears that she was treated primarily for symptoms surrounding panic disorder and depression. Id. On February 14, 2008, Menne's global assessment of functioning ("GAF") score was recorded at 60, and her score for the past year was listed as 70.[3]

In March 2010, State agency Single Decision Maker ("SDM")[4] Robert Chaplin and psychologist Dr. Donald Bruce extensively reviewed the medical evidence. (R. 62-75). Chaplin evaluated Plaintiff's physical residual functional capacity on March 24, 2010. (R. 69-71). He observed that she had certain exertional limitations. (R. 70). She could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and sit for 6 hours in an 8-hour workday, and could occasionally climb ladders, ropes or scaffolds, stoop, kneel, crouch, or crawl. Id. Additionally, she had no manipulative, visual, communicative, or environmental limitations. (R. 70-71).

Dr. Bruce performed Plaintiff's mental residual functional capacity assessment on March

[3] The GAF scale is a numeric scale (0 through 100) sometimes used for reporting the clinician's judgment of an individual's overall level of functioning at a specific point in time. A GAF score in the 51-60 range indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders Text Revision 34 (4th ed. 2000). A score in the 61-70 range indicates some mild symptoms or some social difficulty, but generally means that the person is "functioning pretty well, [and] has some meaningful interpersonal relationships." Id. In its later revision, the DSM stopped utilizing the GAF scale, due in part to its "conceptual lack of clarity." Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

[4] The SDM acronym "connotes no medical credentials." Penley v. Astrue, 1:08CV534, 2011 WL 2748609, at *2 n.1 (W.D.N.C. July 13, 2011).

25, 2010. (R. 71-72). While Menne had no understanding and memory limitations, she did have sustained concentration and persistence limitations. (R. 71). Dr. Bruce noted that she was moderately limited in her ability to follow detailed instructions, to maintain concentration for extended periods, to maintain regular attendance and punctuality, and to fully complete a normal workday or week without psychological interruptions. Id. Additionally, Dr. Bruce observed that Plaintiff had social-interaction limitations. Id. Specifically, she was limited in her ability to appropriately interact with the public and to accept instruction or criticism from supervisors. (R. 72). Lastly, Dr. Bruce stated that Menne was moderately limited in her ability to adapt to changes in the workplace and to set realistic goals. Id.

Given these results, Plaintiff was deemed unable to perform her past relevant work. (R. 73). However, the limitations she required did not "significantly erode the occupational base" available. (R. 74). Consequently, Plaintiff was considered not disabled. Id. In reaching this decision, Chaplin observed that "the medical evidence showed no significant inability to move about and no severe muscle or nerve damage which would have prevented [Menne] from performing normal daily activities." Id. Additionally, while her mental condition prior to the date last insured hindered her ability to perform some tasks, she "should have been able to take care of personal needs, understand and follow simple directions, and perform simple, routine work." (R. 75). Ultimately, though she was unable to perform her past relevant work, "it [was] concluded that [she was] able to perform other jobs which were less demanding." Id. Hence, she did not qualify for disability benefits. Id.

Plaintiff filed for reconsideration on May 28, 2010, alleging longer seizures occurring at a higher rate beginning in March 2010. (R. 77-78). On August 26, 2010, after reviewing the Record, Case Reviewer Dr. Robert Castle and Disability Adjudicator Sharlene Almazan

confirmed that Menne was not disabled on any date through September 30, 2008. (R. 85-86). Specifically, Dr. Castle reviewed the medical evidence and concluded that Menne could lift fifty pounds occasionally and twenty-five pounds frequently, and sit or stand six hours out of an eight-hour day. (R. 83). Dr. Castle also suggested a postural limitation of avoiding heights due to Menne's reports of "seizures or 'spells'" thought to be "psychogenic" in nature. (R. 84).

In addition to the medical evidence, Menne testified before the ALJ that she eventually stopped working in April 2007 due to her daughter's medical needs. She then stated that she was unable to work because of her own medical condition beginning in August 2007due to recurrent TIA's, depression, suicidal thoughts, and feelings of worthlessness. (R. 35). Her weekly visits to Churchland Psychiatric Associates were reportedly helpful in teaching her to deal with those symptoms. (R. 36). Menne also testified that her mother would come over each morning to help prepare her daughter for school and to otherwise look after Menne, making her "pretty much the primary caregiver for both [her] daughter and [her]self." (R. 40).

On an average day during this period, Menne testified she typically slept from 8:00 a.m. until 3:30 in the afternoon. (R. 45). She testified that she slept so much each day because of her depression and medication. Id. Menne's mother also testified that while Menne remained asleep most of the day (R. 55), she was still able to complete half of the household chores. (R. 53). The only community activity she participated in was a weekly, one-hour bible study. (R.46). She also tried to participate in field trips her daughter's school planned, which occurred once or twice per month. (R. 47). Overall, Menne reported that her energy level throughout this period was "very low." (R. 49).

Finally, the ALJ also heard from Robin Stromberg, a vocational expert ("VE"). (R. 55). The VE described Menne's prior employment as an office manager as sedentary, skilled

employment, as an office assistant as sedentary, unskilled employment, and as an LPN as typically medium duty, skilled employment, but in Menne's case, as "very heavy, skilled" employment. (R. 55-56). In response to hypothetical limitations framed by the ALJ,[5] the VE testified that Menne could perform the jobs of office worker, hand packer, and credit authorizer – all light or sedentary, unskilled work. (R. 56-57). Additionally, the VE stated that no jobs would be available for a hypothetical individual who slept or lied down to the extent that Menne stated she did on a typical day, or who had to miss more than one day of work per week due to seizures, TIAs, or recovery time for either. (R. 57).

## III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows

[5] The ALJ asked the VE to assume a person of the same age, education, and background as Menne capable of "light work, provided the work would not require more than occasional postural activities with no balancing, climbing or exposure to heights or hazards." (R. 56). Additionally, the work would need to be simple and routine, with limited interaction with people. Id.

reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

**A. The ALJ's Decision**

In this case, after first finding that Menne last met the insured status requirements of the Social Security Act on September 30, 2008, the ALJ made the following findings under the five

part analysis: (1) Menne did not engage in substantial gainful activity during the period from her alleged onset date of August 1, 2007 through her last insured date of September 30, 2008; (2) Menne had severe impairments of recurrent transient ischemic attack (TIA), seizure disorder, arrhythmia, fibromyalgia, mood disorder, anxiety disorder, and somatoform disorder; (3) her combination of impairments did not meet one of the listed impairments in Appendix 1; and (4) Menne had the RFC to perform light work with specified limitations to avoid heights or hazards, and limited to occasional communication with co-workers or supervisors, and simple, routine tasks. Finally, although the ALJ concluded that Menne could not perform her past relevant work, he did identify jobs which exist in significant numbers in the national economy which Menne could perform. (R. 10-20).

Menne now argues that the ALJ erred in determining her RFC. Specifically, she claims that the ALJ: (1) improperly evaluated the medical evidence, and (2) gave substantial weight to the finding of the State agency SDM Robert Chaplin, an individual who allegedly neither interviewed Menne nor has any medical background. The Court considers each argument below.

**B. The ALJ properly evaluated the evidence bearing on Menne's RFC.**

Menne contends that the ALJ erred in determining her RFC, which is defined as the plaintiff's maximum ability to work despite her impairments. 20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. § 404.1520(e). After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform his past relevant work. Id. at § 404.1545(a)(5)(i). If it is determined that the plaintiff cannot

perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id. at 404.1545(a)(5)(ii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC. Id. at § 1546(c). RFC is determined by considering all the relevant medical and other evidence[6] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Menne has the RFC to perform light work with specified limitations. (R. 14-18).

Menne first contends that the ALJ erred by improperly considering and evaluating the evidence submitted by her treating physicians. (ECF No. 10 at 3). Although she has not identified any specific medical record which contradicts the ALJ's findings, she complains generally that the ALJ "ignored and overlooked the records of multiple health care providers concerning Ms. Menne's medical condition." Id. at 8. Menne further contends that the ALJ assigned improper weight to the opinions of SDM Robert Chaplin and Dr. Bruce, individuals employed by the State agency to evaluate Menne's claims. Specifically, he "gave substantial weight to the finding of Robert Chaplin, and there is no evidence that Robert Chaplin has any medical training or any evidence that he interviewed Ms. Menne or any of the health care providers." Id. at 8-9.

---

[6] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. Id. at § 404.1527(d)(2).[7]

Here, the ALJ found, after "careful consideration of the entire record," that Plaintiff is capable of performing light work with additional detailed limitations to account for her disabling

[7] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, nontreating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(ii).

condition. (R. 14). In making the RFC determination, the ALJ provided a lengthy review of Plaintiff's treatment record including emergency room and general hospital records, and the records of treating physicians Dr. Zhu, Dr. Christian-Taylor, Dr. Dixit, and psychologist Ann D. Mingione. (R. 16-18). Importantly, none of these providers ever opined that Menne's condition was disabling or work-limiting in any capacity. The ALJ determined that while Menne's medically determinable impairments could be reasonably expected to cause the alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (R. 16). Taken together, the ALJ determined that the "medical evidence from the period of August 2007 through September of 2008, does not support disability" because "[t]he frequency, duration, location, and intensity of symptoms and limitations alleged by the claimant are unsupported by the objective medical findings of record and treatment notes." (R. 16). Menne has not identified an objective medical record inconsistent with this finding. (R. 83).

The ALJ did credit Menne's statements that she had suffered from TIAs during the relevant period. But he found her description of the condition inconsistent. Not only did her own testimony vary concerning the frequency and severity of the episodes, but it was also at odds with the medical record. At one time she testified that she suffered four episodes of TIAs during the year between the onset and date-last-insured. (R. 38). She also described 8-10 seizures per month during this time. But her medical records contain no mention of seizures during this period and also reflect decreasing episodes of TIAs. The ALJ observed that after her cardiac surgery to close the PFO in May 2008, she reported only two episodes of TIAs at the cardiac follow up on August 21, 2008.

In addition to the medical evidence, the ALJ also relied upon the RFC assessments performed by State agency SDM Robert Chaplin and State agency psychologist Dr. Donald K. Bruce – each of whom found that Plaintiff had the RFC to perform work. (R. 17-18). The ALJ states that he considered this opinion evidence, and because it was consistent with the objective medical and mental health treatment notes of record, the findings were given "great weight." (R. 18). Accordingly, the ALJ wrote that their findings formed the basis for the physical and mental limitations in the ALJ's determination of Menne's RFC. Id.

Plaintiff contends that the ALJ assigned improper weight to the opinions of Mr. Chaplin and Dr. Bruce, but provides little argument on this point beyond her claims that Mr. Chaplin had no medical training and failed to contact any of Plaintiff's healthcare providers, and that neither individual ever met personally with Plaintiff. (ECF No. 10 at 6). Although not cited, there is authority that "the opinion of an SDM, standing alone, is not substantial evidence on which the ALJ can rely to satisfy his obligations to develop an RFC." Fisher v. Astrue, 1:10CV073, 2011 WL 4965030, at *3 (W.D.N.C. Oct. 19, 2011). See also Nicholson v. Astrue, 1:09CV271, 2010 WL 4506997 (W.D.N.C. Oct. 29, 2010). In Menne's case, however, the ALJ's decision was not in error.

In Nicholson, the only evidence related to residual functional capacity was produced by an SDM. 2010 WL 4506997 at *2. Since an SDM's opinion is not a medical source, and "[s]ince the ALJ stated that he was relying on the SDM's 'medical' opinion to the exclusion of all other evidence of residual capacity, this alone mandate[d] reversal of the ALJ's decision." Id. at *6. Fisher stands for essentially the same proposition – that an ALJ cannot solely rely upon evidence from an SDM in reaching an RFC decision. 2011 WL 4965030 at *3. There, however, the court recognized that the ALJ did not exclusively rely on the SDM's opinion in determining

the applicable RFC. To the contrary, in addition to the SDM, the ALJ specifically cited the opinion of a physician who filed a Case Analysis, a document from an accepted medical source. Id.

Here, as in Fisher, the ALJ did not solely rely upon the opinion of the SDM, Mr. Chaplin. Rather, he made his determination after a detailed examination of Plaintiff's objective medical record. For example, he recognized that the "medical evidence from the period of August 2007 through September of 2008, does not support disability." (R. 16). Her treatment for TIAs and seizures was "routine and conservative," Dr. Zhu referenced "normal" brain scans and "did not mention the occurrence of seizures," Menne had no "cardiopulmonary abnormality," her "primary care provider notes do not mention seizures or a seizure diagnosis," her treatment record for fibromyalgia does not establish any disability, and her mental treatment was "routine and conservative." (R. 16-17). Moreover, the record reflects that the ALJ also considered the opinion of Dr. Robert Castle, M.D, an MC/PC Case Reviewer who determined on reconsideration that Menne was not disabled.[8] (R. 18).

Regarding Mr. Chaplin specifically, the ALJ determined, after his own review of Menne's medical records, that Mr. Chaplin's findings were "consistent with the objective medical findings of record for the period in question," and those findings were "given great weight." (R. 18). Thus, Mr. Chaplin's opinion was not the sole basis for the ALJ's RFC determination. See e.g., Fisher, 2011 WL 4965030 at *3 (recognizing that the ALJ did not exclusively rely upon the SDM's opinion when deciding plaintiff's physical RFC). In addition, the ALJ consistently referred to Chaplin appropriately by the "SDM" designation or simply as "Mr. Chaplin," and thus did not improperly weigh his findings as medical evidence. Moreover,

---

[8] The ALJ does not cite to Dr. Castle by name, but twice relied on the exhibit comprising Dr. Castle's disability determination explanation. (R. 18). Dr. Castle's physical limitations were less restrictive than those found by the ALJ.

Plaintiff has not indicated – and the Court's own review has not disclosed – any other opinion evidence from a treating or examining physician that suggests she suffered from any greater impairment than what the ALJ noted.

A claimant's RFC is determined by considering all the relevant medical and other evidence in the record and the weight assigned to an opinion is in part determined by how consistent it is with the medical record. "Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs," the ALJ is required to consider their factual determinations about the "nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists." SSR 96-6p. While the ALJ is not bound by these findings, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions." Id. The opinion of a non-examining, non-treating physician, in turn, can be relied upon when the opinion is consistent with the record. Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Additionally, "[w]hen the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence." Armentrout v. Astrue, 3:10CV504, 2011 WL 4625931, at *4 (E.D. Va. June 2, 2011) report and recommendation adopted, 3:10CV504, 2011 WL 4625912 (E.D. Va. Oct. 3, 2011).

Here, the ALJ carefully considered the entire record, and per Section 404.1527(e) and SSR 96-6p, stated why he afforded great weight to the State agency consultants. (R. 18) Specifically, his review revealed that their findings were "consistent with the objective medical findings of record for the period in question" and "consistent with mental health treatment notes." (R. 18). Menne points to no contrary evidence – opinion or otherwise. Upon its review

of the record and the ALJ's report, the Court finds that the ALJ sufficiently explained how he determined the weight assigned to all of the evidence, including the medical records from Menne's treating providers, and the opinions of the State agency consultants, and did not err in determining Menne's RFC.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that the final decision of the Commissioner be affirmed.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this

Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

November 12, 2013